UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRANDI A. BUKOWSKI,

      Plaintiff                              Civil Action No. 13-12040

v.                                    HON.  LAURIE J. MICHELSON
                                            U.S. District Judge
                                            HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Brandi A. Bukowski ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's motion for summary judgment be GRANTED [Docket #19] and that Plaintiff's motion for summary judgment be DENIED [Docket #14].

## PROCEDURAL HISTORY

On July 14, 2010, Plaintiff filed applications for Disability Insurance Benefits ("DIB") (Tr.  160-166)  and Supplemental Security Income ("SSI") (Tr. 106-112, 112-116) alleging disability as of March 2, 2010 (Tr. 106).  After the initial denial of the claim, Plaintiff filed

-1-

a timely request for an administrative hearing, held on July 19, 2011 in Mt. Pleasant, Michigan before Administrative Law Judge ("ALJ") Ronald Herman (Tr. 36). Plaintiff, represented by attorney Matthew Taylor, testified (Tr. 39-53), as did Vocational Expert ("VE") Jessica Christensen (Tr. 53-57). On September 6, 2011, ALJ Herman found that Plaintiff was not disabled (Tr. 30-31). On April 9, 2013, the Appeals Council denied review (Tr. 1-6). Plaintiff filed for judicial review of the final decision on May 8, 2013.

## BACKGROUND FACTS

Plaintiff, born October 6, 1987, was 23 when the ALJ issued his decision (Tr. 31, 106). She completed 10th grade and worked as a care giver (Tr. 130-131). She alleges disability as a result of bipolar disorder, anxiety, Attention Deficit Disorder ("ADD"), hypothyroidism, kidney disease, and back pain (Tr. 130).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

She lived in Bay City, Michigan (Tr. 39). She worked previously as a babysitter (Tr. 40). She had been diagnosed with stage five kidney disease, but was currently taking medication that controlled the condition (Tr. 41-42). She did not drive because she was unable to "multi-task" (Tr. 44). She left school in 10th grade (Tr. 44). She believed that she ought to have been placed in special education due to reading comprehension problems (Tr. 44). She also experienced difficulty performing simple calculations (Tr. 45).

Plaintiff was unable to work because of back pain, fatigue, anxiety, and breathing

problems (Tr. 45).  She experienced loss of appetite due to stress (Tr. 46).  On a typical day, she arose, took a shower, and dressed her children, ages three and four months, then walked to her mother's house to drop them off (Tr. 46).  She spent the rest of the day "go[ing] to appointments" (Tr. 46).  She experienced problems caring for her three-year-old, noting that she relied on her mother to care of the children up to four days each week (Tr. 47).  She had seen her kidney specialist once every one or two months, but had been told by the specialist that she could wait for up to three months for the next appointment (Tr. 47).  She experienced anxiety in public places, noting that she felt that she was being watched (Tr. 48).  Her outside activity was restricted to going to her mother's house, a nearby park, or the grocery store (Tr. 48, 50).

Plaintiff also experienced mood swings characterized by feeling happy one minute and being angry or sad the next (Tr. 48).  She experienced crying jags up to five times a week (Tr. 49).  Her crying jags were precipitated by her childcare responsibilities and the fact that she was estranged from her older child's father (Tr. 49).  She had suicidal ideation about twice a month (Tr. 49). She experienced chronic sleeping problems due to her children's sleeping schedule (Tr. 49).   She often neglected household chores and experienced problems concentrating (Tr. 50).

During walking trips to her parents' house, Plaintiff sometimes stopped at a park to let her three-year-old play, then "stop by the store to get . . . something" before going to visit her mother (Tr. 50).  She would typically spend time with her mother helping with household

-3-

chores or playing with her children (Tr. 51).  Otherwise, most of her time was spent at her

own home with her children (Tr. 51).  She felt overwhelmed by her need to arrange rides to

appointments, find babysitters, and pay for diapers (Tr. 51).  Her limitations as a result of

kidney disease were no lifting over 30 pounds and intermittent nausea and dizziness (Tr. 52).

She reiterated that the primary cause of her inability to work was emotional problems such

as stress, crying spells, and avoidance of others (Tr. 52).  She experienced crying spells four

or five times a week for 30 to 60 minutes as a result of stress and her failed relationship with

her old child's father (Tr. 53).

### B.    Medical Records

### 1. Treating Sources

Psychological counseling records from June, 2009 state that Plaintiff sought therapy

to "resolve issues" relating to her former boyfriend (Tr. 243).  She noted that she was

motivated to resolve her problems and that she received support from her parents (Tr. 244).

August, 2009 therapy records note Plaintiff's report of low energy (Tr. 245).  Notes from the

following month state that she was "doing better on meds" (Tr. 253).   Plaintiff aspired to

own a daycare service (Tr. 246).   Barry R. Binkley, M.D. assigned her a GAF of 45 due to

bipolar disorder, anxiety, and Attention Deficit Hyperactivity Disorder[1] (Tr. 247).

---

[1]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* ("*DSM-IV-TR*") at 34 (4th ed. 2000).

In April, 2010, Plaintiff was hospitalized with discharge diagnoses of acute appendicitis and acute renal failure (Tr. 222). The following month, she was discharged from therapy after failing to attend a work program (Tr. 249). At the time of discharge, Plaintiff was assigned a GAF of 60 with diagnoses of anxiety and bipolar with "passive aggressive traits"[2] (Tr. 248). Dr. Binkley found that at the time of discharge, she experienced only "mild" functional impairments (Tr. 249). June, 2010 physical examination notes by Marco A. Ramos, M.D. state that Plaintiff experienced stage four kidney disease (Tr. 260). Her examination was otherwise unremarkable (Tr. 259). In addition to medication, Dr. Ramos recommended a low salt diet (Tr. 260). July, 2010 medical records state that Plaintiff also experienced nausea due to pregnancy (Tr. 279). Blood tests revealed heightened creatinine levels (Tr. 284).

Psychological intake notes from the following month state that Plaintiff, 22, reported depression, anxiety, mood swings, and "medical complications" due to the kidney condition (Tr. 264). Plaintiff admitted to past suicidal ideation, but denied current ideation (Tr. 264). She went out in public on an "as needed basis," only, but was able to take walks and visit friends (Tr. 265). She stated that she was not employed and "was not seeking employment" (Tr. 265). She stated that she received money from babysitting and "doing side jobs" (Tr. 265). She reported that her expenses were limited to "providing for her daughter, telephone,

---

[2]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

and her daughter's medication (Tr. 265). She stated that she was "good at managing her budget" (Tr. 265). She had recently applied for "Section 8" housing but was denied funds (Tr. 266). Plaintiff reported that kidney-related pain ranged from "tolerable" to debilitating" (Tr. 266). She reported that she enjoyed cleaning and performed most of her family's housekeeping chores (Tr. 267). She indicated that her father had been diagnosed with "schizophrenia and bipolar disorder" (Tr. 268). She was assigned a GAF of 51 with bipolar disorder and a "social phobia" (Tr. 269). September, 2010 counseling notes state that Plaintiff responded appropriately when the father of her daughter (apparently upset that Plaintiff had become pregnant by another man) was verbally abusive (Tr. 342).

The following month, Plaintiff reported stress as a result of both her grandmother's illness and a possible rapprochement with her daughter's father (Tr. 344, 347). Social worker Valerie Yurgaitis noted Plaintiff's statement that she was unable to work due to the pregnancy and renal failure (Tr. 345). Plaintiff reported that she had already been denied disability benefits three times, but had hired a lawyer to help her with her appeal (Tr. 345). She denied suicidal ideation (Tr. 348). She reported stress and personality conflicts as a result of living with her parents but declined Yurgaitis' recommendation to go to a homeless shelter (Tr. 348). Also in October, 2010, Maliha N. Shaikh, M.D. made an initial assessment of Plaintiff's history of kidney problems, noting a probable diagnosis of chronic "Stage III" kidney disease (Tr. 366).

In December, 2010, Plaintiff reported that she was depressed and "stressed" living

with her parents but anticipated that she would be moving to an apartment in a building that her father was buying (Tr. 350). She denied depression (Tr. 351). The following week, Plaintiff sought emergency treatment, reporting suicidal thoughts precipitated by an argument with her father (Tr. 320). She reported that she had started Zyprexa one week earlier (Tr. 320). Plaintiff, 26 weeks pregnant, admitted to marijuana use three to four days earlier (Tr. 321). She reported that in addition to Zyprexa, she was taking Synthroid for hypothyroidism (Tr. 321). She was assigned a GAF of 35 with a fair prognosis and referred for substance abuse treatment[3] (Tr. 324). She was discharged in stable condition with a GAF of 42 (Tr. 336, 339). The same month, Javed Zia, M.D. performed an initial evaluation of Plaintiff's kidney condition, noting that creatinine levels were reduced from June, 2010 studies (Tr. 327). He noted that Plaintiff was asymptomatic (Tr. 327). He found that the kidney condition was "stable" (Tr. 329).

In January, 2011, therapist Phil Sweet noted that side effects from Zyprexa were limited to "tiredness and dry mouth" (Tr. 352). He assigned her a GAF of 50 (Tr. 352). Later the same month, Plaintiff reported that she had been "doing well" (Tr. 358). She attributed physical symptoms to her pregnancy (Tr. 353). The last week of the month, she reported an increase in depression, but noted that she would be using her tax refund "for a

---

[3]A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM–IV–TR* at 34.

deposit and several months' rent" on an apartment of her own (Tr. 354).   Dr. Shaikh noted the absence of symptoms related to kidney disease (Tr. 376, 380).   In February, 2011, Plaintiff reported that symptoms of depression had lessened (Tr. 356).

The following month, Plaintiff gave birth to a second daughter (Tr. 358).   In April, 2011, Plaintiff reported that the daughter had been born with a congenital hyperthyroid condition requiring medication and monthly doctors' visits (Tr. 358).   She reported strong support from her parents and siblings (Tr. 358).   In May, 2011, Yurgaites found that Plaintiff experienced moderate limitations in carrying out detailed instructions, maintaining attention for extended periods, working within a schedule, accepting criticism, interacting appropriately with others, responding appropriately to workplace changes, and making independent plans (Tr. 361-362).   Yurgaites found marked limitations in the ability to complete a normal workweek without psychologically based interruptions (Tr. 361).

The same month, Dr.  Shaikh noted "acute worsening" of kidney disease due to Plaintiff use of Tylenol following a cesarian section (Tr. 386).   A renal biopsy was consistent with Stage IV chronic kidney disease (Tr. 389).   She appeared asymptomatic but was prescribed Vasotec for elevated blood pressure (Tr. 393).

## 2.  Non-Treating Sources

In January, 2010, psychologist Michael Brady, Ph.D. performed a consultative psychological exam of Plaintiff (Tr. 211-217).   He noted Plaintiff's report that she experienced learning disabilities and comprehension problems (Tr. 211).   She alleged

depressive episodes two to three times a month and past episodes of self mutilation, but denied current symptoms (Tr. 211).   She had been attending therapy sessions for the past four months and was currently taking Synthroid for hypothyroidism (Tr. 211).  She spent a typical day taking care of her daughter and cleaning (Tr. 212).

Plaintiff exhibited a normal mood   (Tr. 212).   Her physical appearance was unremarkable and she exhibited a normal gait (Tr. 212).  She denied problems finding the exam location (Tr. 212).  She denied suicidal ideation (Tr. 213).  She was unable to perform "serial seven" calculations (Tr. 213).  Dr. Brady found that her "ability to relate and interact with others" and maintain concentration was "good" (Tr. 214).  He found that she was capable of dealing with "normal workplace stressors appropriately" (Tr. 214).  He diagnosed her with depression ("in early partial remission") but assigned her a GAF of 75[4] (Tr. 214).

The same day, Dr. Brady administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV") noting a full-scale IQ of of 74 placing Plaintiff in the "borderline intellectual functioning" range (Tr. 218).

In August, 2010, Wayne Hill, Ph.D. performed a non-examining assessment of Plaintiff's treating and consultative medical records (Tr. 300-309).  He determined that

---

[4]A GAF rating of 71–80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM–IV–TR*"), 34 (4th ed.2000).

Plaintiff experienced the medically determinable impairments of borderline intellectual functioning and affective disorders (Tr. 304). He found that Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate deficiencies in concentration, persistence, or pace (Tr. 304). He found the absence of additional medically determinable impairments (Tr. 308).

### 3. Evidence Submitted After the September 6, 2011 Administrative Decision[5]

May 11, 2012 psychiatric discharge notes summarize Plaintiff's three-day inpatient hospitalization (Tr. 396-411). She was prescribed Zoloft and Risperdal after being involuntarily admitted after taking an overdose of Xanax which had been purchased "off the street" (Tr. 397, 400). She indicated that she had recently been evicted from her apartment but that her children were staying with her parents (Tr. 401). Treating sources noted that she was non-compliant with prescribed psychotropic medications (Tr. 406). She reported a "good" mood at the time of discharge with a GAF of 50 (Tr. 397). Plaintiff was discharged after making plans to live with her mother (Tr. 404).

### C.   Vocational Expert Testimony

VE Jessica Christensen classified Plaintiff's former work as a child monitor as

---

[5]

Evidence submitted after an ALJ's decision has issued is subject to a narrow review by the district court. *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir.1993). To establish grounds for a "Sentence Six" remand based on such material, the claimant must show that the "new evidence is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ..." 42 U.S.C. § 405(g). Since Plaintiff does not cite these records in support of her arguments for remand, the Court need not determine whether they support a remand pursuant to the sixth sentence of § 405(g).

exertionally medium and semiskilled[6] (Tr. 55).  The ALJ then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, and work history:

> [N]o lifting over 20 pounds, 20 pounds occasionally, 10 pounds more frequently.  She can stand and/or walk for up to six of eight hours, sit for two of eight hours, and with regards to any other limitations I would leave that open.  Let's go more towards the non-exertional limitations, she can only perform simple, routine, repetitive type of work activity, and further the individual should only have occasional contact with the public, coworkers, and supervisors.  Would there be any jobs - - first of all, could she perform her past work? (Tr. 55-56).

The VE stated that the above limitations would preclude Plaintiff's past relevant work, but would allow the hypothetical individual to perform the unskilled, light work of a garment sorter (2,500 positions in existence in the lower peninsula of Michigan); laundry worker (2,500); and small product assembler (2,000) (Tr. 56).  The VE testified that if the same individual were restricted to "limited" interaction with the general public and coworker, (rather than occasional) the job numbers would not be affected (Tr. 59).  She testified further that if the same individual were required to miss work at least three times a month due to problems "staying on task" and "attention and concentration lapses," all work would be

---

[6]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;"  *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

precluded (Tr. 57).

**D.  The ALJ's Decision**

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "kidney disease, hypothyroidism, borderline intellectual functioning, and bipolar disorder," but that none of the conditions met or medically equaled an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 22-23).  He found that Plaintiff experienced mild deficiencies in activities of daily living, moderate deficiencies in social functioning and mild deficiencies in concentration, persistence, or pace (Tr. 24).  The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for light work with the following limitations:

> [she] can perform simple, routine, repetitive work activity.  She can be in occasional contact with the public, co-workers, and supervisors (Tr. 26).

Citing the VE's job findings, he found that Plaintiff was unable to perform any of her former jobs but could work as a garment sorter, laundry worker, or assembler (Tr. 30).

The ALJ discounted Plaintiff's allegations of limitation.  He noted that Plaintiff's conditions improved when when she was compliant with medication use (Tr. 26-27).  He cited treating records showing that she failed to take her hypothyroid medication regularly (Tr. 27).  He acknowledged that Plaintiff's work activity since the alleged onset of disability date did not constitute substantial gainful activity but found that her ability to perform work-related activities stood at odds with her professed degree of limitation (Tr. 27).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less than a preponderance.   It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

-13-

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## <u>ANALYSIS</u>

### A.  The Step Three Determination

Plaintiff argues that the Step Three finding that none of her conditions medically equaled a listed impairment is not supported by substantial evidence. *Plaintiff's Brief*, 4-10, *Docket #14.*  She acknowledges that kidney disease, hypothyroidism, and borderline intellectual functioning and borderline intelligence do not meet a listed impairment.  *Id.* at 8.  However, she contends that the ALJ failed to articulate or support his reasons for finding that the  the physical and mental conditions, considered together, would medically equal a listing.  *Id.*

As a preliminary matter, there is a distinction between the Step Three finding that a

claimant does not *meet* a listed impairment and the finding that she did not *medically equal* a listed impairment.  In contrast to the former, an equivalency finding must be supported by opinion evidence. "[W]hile an ALJ is capable of reviewing records to determine whether a claimant's ailments meet the Listings, expert assistance is crucial to an ALJ's determination of whether a claimant's ailments are equivalent to the Listings." *Stratton v. Astrue,* — F.Supp. 2d — , 2012 WL 1852084, *12 (D.N.H. 2012)(citing SSR 96-6p, 1996 WL 374180, *3)("Longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight"). *Id.*  "This is presumably because making an equivalency finding requires difficult medical judgments as to the severity of a claimant's ailments, judgments that are greatly assisted by consulting an expert." *Id.* at *12.

In addition to the signature of a medical expert on the Disability Determination and Transmittal Form made at the time of the initial determination, a finding regarding equivalency can be obtained through a "Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings." SSR 96-6p at *13.  However, an equivalency finding by a "single decision maker" ["SDM"] does not constitute opinion evidence.  "The single decisionmaker model stems from 20 C.F.R. §§ 404.1406(b)(2)" and 404.906(b)(2)," which "provide for an experimental, stream-lined procedure that eliminated the reconsideration level of review," permitting

"claims to go directly from the initial denial to ALJ hearing" for the purpose of allowing

"'the single decisionmaker to render the initial denial of benefits without documenting

medical opinions from the state agency medical consultants.'" *Lindsey v. Commissioner of*

*Social Sec.,* 2013 WL 6095545, *6 (E.D.Mich. November 20, 2013)(citing *Crooks v.*

*Comm'r of Soc. Sec.,* 2013 WL 4502162, at *9 (E.D.Mich. Aug.22, 2013))(punctuation

omitted).   However, in an ALJ's determination, "RFC forms completed by SDMs" do not

constitute "'opinion evidence'" *Id.* (citing Programs Operations Manual System ("POMS")

DI § 24510.05)).   "'[U]nder the regulations and agency policy, SDM assessments have no

place in an ALJ's disability determination.'" *Id.* (citing *White v. Comm'r of Soc. Sec.,* 2013

WL 4414727, *8 (E.D.Mich. Aug.14, 2013)).

  The initial finding that Plaintiff did not meet or medically equal a listed *psychiatric*

impairment was made by psychiatrist Wayne Hill (Tr. 64, 69).   In contrast to the signature

of an SDM, "[t]he signature of a State agency medical or psychological consultant" made on

a Disability Determination and Transmittal Form "ensures that consideration by a physician

(or psychologist) designated by the Commissioner has been given to the question of medical

equivalence at the initial and reconsideration levels of administrative review."   SSR 96-6p,

1996 WL 374180, *3 (July 2, 1996).   Dr. Hill's finding constitutes substantial evidence

supporting the ALJ's Step Three finding that Plaintiff's psychiatric conditions did not meet

or medically equal a listed impairment.

  SDM Janet Grimm reviewed the allegations of *physical* limitation  (Tr. 303).  She

-16-

cited treating records showing that the kidney condition was stable, Plaintiff's admitted ability to lift up to 50 pounds, and the lack of reference to back pain in the medical records (Tr. 303). Having found the absence of a medically determinable condition, she did not reach the question of whether the physical conditions medically equalled any of the listed impairments. While the SDM may have impliedly found that Plaintiff's physical conditions did not medically equal a listed impairment, her findings do not constitute opinion evidence, *See* POMS, DI § 24510.05, although Dr. Hill's analysis of the mental conditions and his signature on the Disability Determination and Transmittal Form indicating that Plaintiff did not meet or medically equal a listed impairment could arguably be read to encompass the physical ones as well.

This Court is mindful that in some cases, opinion evidence regarding equivalency of the psychiatric conditions does not remedy the lack of opinion evidence regarding the physical conditions. *See Trainor v. Commissioner of Social Sec.,* 2014 WL 988993, *24 (E.D.Mich. 2014)(physician's signature on the Determination Transmittal Form and analysis of psychiatric evidence did not cure his failure to consider equivalency regarding the physical impairments). However, even assuming that Dr. Hill's Disability Determination cannot be interpreted to encompass the physical conditions, the dearth of evidence suggesting that the physical conditions (combined with the mental) equaled a listed impairment defeats Plaintiff's argument. First, Plaintiff admitted during the administrative hearing that despite kidney disease, she was able to lift up to 30 pounds (Tr. 52), well above the 20-pound

-17-

limitation in the RFC (Tr. 26). Moreover, Plaintiff acknowledged that psychological problems were the primary cause of her alleged disability (Tr. 52). Consistent with her testimony, Dr. Shaikh's October, 2010 records do not note any functional limitations as a result of the kidney condition (Tr. 366). In December, 2010, Dr. Zia observed that Plaintiff's kidney condition was asymptomatic (Tr. 327). The following month, Dr. Shaikh also noted the absence of kidney-related symptoms (Tr. 376, 380). While Dr. Shaikh observed that the kidney condition worsened as a result of Plaintiff's Tylenol use following a cesarian section, the condition continued to remain asymptomatic (Tr. 393).

Aside from the medical records by the kidney specialists showing that Plaintiff was uniformly asymptomatic, none of the other evidence supports the finding that her physical conditions, along with the mental ones, would equal a listing. While Plaintiff reported nausea and fatigue in the months following the diagnosis of kidney problems, treating notes state that she attributed the condition to her pregnancy rather than the kidney condition (Tr. 279, 353). July, 2010 psychological records state that Plaintiff was able to work part time in addition to caring for her daughter (Tr. 265). While she also alleged "tolerable" to "debilitating" pain as a result of kidney problems two months following the onset of the kidney condition, she admitted that the condition did not prevent her from performing most of her family's housekeeping chores (Tr. 267). Plaintiff provides no support for her assertion that her need for "dialysis or a kidney transplant in the near future" would be equivalent to lowering her IQ score from 74 to 70 (thereby meeting one of the criteria for

disability under Listing 12.05(C)(mental retardation) or transform at least two of her functional limitations from "mild" or "moderate" (as found by the ALJ) to "marked" as required to establish disability under Listing 12.04 (affective disorders).[7]   *Plaintiff's Brief* at 9.   "[I]t is Plaintiff's "burden to prove that he has an impairment or combination of impairments ... medically equal to one listed in, 20 C.F.R. Pt. 404, Subpt, P, App. 1. To do so, [s]he must ... present medical evidence that describes how her impairment is equivalent to a listed impairment.""" *Gallagher v. Commissioner of Social Sec.,* 2011 WL 3841632, *8 (E.D.Mich. March 29, 2011)(citing *Lusk v. Commissioner of Soc. Sec.,* 106 F. App'x 405, 411 (6th Cir.August 6, 2004).   Plaintiff has not met her burden.

I recognize that the ALJ's finding that the physical impairments of kidney diseaseand hypothyroidism were "severe" impairments at Step Two of the sequential analysis differs from the Disability Determination finding the absence of *any* physical medically determinable impairment (Tr. 22).   However, the fact that the ALJ acknowledged the physical conditions at Step Two does not imply that the conditions were so pronounced as to  meet or medically equal a listed impairment.   An impairment should be omitted at Step

---

[7]

While Plaintiff also argues that the ALJ erred by finding "no episodes of decompensation," the applicable "paragraph C" criteria under Listing 12.04 requires "repeated episodes of decompensation each of extended duration" (Tr. 24-25).   Even assuming that Plaintiff's five-day inpatient stint constituted one episode of decompensation, it was not "extended" (two weeks or more) and it was not "repeated."   Thus, the ALJ did not err in finding that Plaintiff did not meet the "paragraph C" requirements under Listing 12.04 (Tr. 24).   Plaintiff's additional arguments relating to the ALJ's adoption of Dr. Hill's functional impairments are discussed in Section C., below.

Two *i.e.* deemed

non-severe "only if the impairment is a 'slight abnormality which has such a minimal effect

on the individual that it would not be expected to interfere with the individual's ability to

work, irrespective of age, education and work experience.' " *Farris v. Secretary v. HHS*, 773

F.2d 85, 89 (6th Cir.1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984)).

The ALJ generously acknowledged the medical records showing Plaintiff's ongoing

treatment for the kidney condition, but in support of his finding that the condition did not

equal a listed impairment, cited her ability to clean, shop, cook, take public transportation,

pay bills, care for herself, use a telephone and directories, use a post office, care for her

children by herself, play with her children at a local park, and walk to the grocery store (Tr.

24). He noted elsewhere that Plaintiff was able to visit friends, cook, and work part-time (Tr.

27).  Because Plaintiff has failed to meet her burden to show that the physical conditions

would medically equal a listed impairment, remand on this basis is not warranted.


### B.   The ALJ's Rejection of Therapist Yurgaitis' Opinion

Plaintiff argues next that the ALJ erred by discounting therapist Yurgaitis' May, 2011

assessment of of Plaintiff's work-related activities. *Plaintiff's Brief* at 11-13 (citing Tr.360-

363).  She contends that the ALJ ought to have adopted Yurgaitis' finding of marked

psychologically-based symptoms as well as Yurgaitis' additional finding of moderate

limitations in the ability to carry out detailed instructions, concentrate for extended periods,

work within a schedule, accept instruction, get along with co-workers, and respond appropriately to workplace changes. *Id.* (citing Tr. 361-362). Plaintiff disputes the ALJ's finding that Yurgaitis' opinion was not consistent with the medical evidence, contending that Yurgaitis' opinion "is fully supported" by the therapy notes. *Id.* Plaintiff concedes that Yurgaitis (a social worker rather than a medical doctor or psychologist) is not an "acceptable source," but argues that the ALJ was nonetheless required to "consider and evaluate" the opinion. *Id.* at 12 (citing 20 C.F.R. § 404.1527(a)(2)(c).

Under 20 C.F.R. §§ 404.1527(a) and 416.927(a)(2), only "acceptable medical sources" can provide medical opinions. An acceptable medical source has been defined to include physicians, psychologist, optometrists, podiatrists, and speech pathologists. 20 C.F.R. §§ 404.1513(a) and 416.913(a). The findings of non-physician medical sources such as nurse practitioners, physician assistants, licensed clinical social workers, and psychological therapists are not technically "acceptable medical sources." SSR 06–03p, 2006 WL 2006 WL 2329939, *2 (August 9, 2006).

Although an "other" medical source is not entitled to deference, the findings by "other" medical sources "should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." *Id.* In certain instances, an "other" source may be entitled to more weight than an acceptable medical source, depending on the length and frequency of treatment; the evidence supporting the opinion, and the explanation provided for the opinion. *Id.* at *5.

-21-

Nonetheless, the scant weight accorded Yurgaites' opinion is well explained and supported by the treating and consultative records (Tr. 28). Plaintiff asserts that in regard to Yurgaites' opinion, the ALJ stated only that it was inconsistent "with the medical evidence of record" (Tr. 28). However, this statement is prefaced by a thorough discussion of the evidence supporting a lesser degree of psychological limitation (Tr. 27-28). The ALJ cited Dr. Brady's finding that Plaintiff had "good" concentration, could deal with routine workplace stressors, and was capable of relating and interacting with others (Tr. 214). He also cited Dr. Binkley's treating records from August, 2009 to May, 2010 showing that Plaintiff's psychological condition improved with a combination of therapy and medication (Tr. 28, 247, 249). He noted that as of May, 2010, Plaintiff experienced only "mild" psychological impairments (Tr. 28, 249). Because substantial evidence supports the ALJ's findings that Plaintiff experienced only "mild" limitation in activities of daily living and concentration, persistence, or pace, and "moderate" limitation in social functioning (Tr. 24) he did not err in rejecting Yurgaites' opinion.

### C. The Vocational Findings

Plaintiff argues that despite the adoption of Dr. Hill's findings, the ALJ did not include all of the limitations found by Dr. Hill in the question to the VE. *Plaintiff's Brief* at 15-16. She notes that although Dr. Hill concluded that Plaintiff was limited to "step one and step two tasks,' these modifiers were not included in the hypothetical question. *Id.* (citing 24, 304). She also revisits her argument that Yurgaitis' opinion ought to have been credited, contending

-22-

that the therapist's May, 2011 opinion was improperly omitted from the limitations posed to the VE.  *Id.*

Plaintiff is correct that a hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments. *Varley v. Commissioner of Health and Human Services,* 820 F.2d 777, 779 (6th Cir.1987). While the Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec.,* 368 F.3d 629, 632 (6th Cir.2004).

Plaintiff's argument that the hypothetical question forming the basis of the job findings was not supported by substantial evidence is not well taken.  First, Plaintiff's position that the hypothetical question ought to have contained a verbatim recitation of all the discrete limitations found by Dr. Hill has been rejected by the Sixth Circuit.  *See Webb, supra,* 368 F. 3d. at 632.   Further, as stated in Program Operation Manual System ("POMS") DI 24510.060(B)(2)(a)), the limitations found in the initial section of Dr. Hill's Assessment (Tr. 306-307) were "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation ..."   By itself, the first section of the non-examining evaluation "does not constitute the RFC assessment." *Id.*  Thus, the ALJ did not err in simply drawing on Dr. Hill's conclusion that despite the presence of a number of moderate psychologically based limitations, Plaintiff could "learn, remember, understand, and

perform step one and step two tasks on a sustained basis" (Tr. 307). The ALJ's question to the VE, limiting the hypothetical individual to "simple, routine, repetitive" work with only "occasional contact with the public, coworkers, and supervisors" more than adequately reflects Dr. Hill's conclusion (Tr. 56).

Plaintiff further faults the ALJ for failing to restate Dr. Hill's conclusion that she was limited to "step one and step two tasks" in the question to the VE. *Plaintiff's Brief* at 16. However, in addition to giving Dr. Hill's opinion "considerable weight," he accorded the same weight to Dr. Brady's opinion, which included the finding that Plaintiff experienced "no more than a slight impairment in social, occupational, or school functioning" (Tr. 27). The ALJ's choice of hypothetical limitations amply account for Dr. Brady's findings of essentially mild psychological and concentration limitation (Tr. 27, 56, 212-214).

On a related note, Plaintiff revisits her argument that therapist Yurgaitis' findings of limitation ought to have been included in the question to the VE. *Plaintiff's Brief* at 15. She contends that the Yurgaitis' opinion that Plaintiff's work abilities would be hindered by the need for frequent rest periods (Tr. 361) is supported by Dr. Hill's finding of "moderate" limitation in this area (Tr. 306). However, substantial evidence supports the conclusion that psychological interruptions would allow for a range of unskilled work. First, Dr. Hill's finding that Plaintiff experienced "moderate" limitations in the ability to work without interruption cannot be read to imply a preclusion on all work, given Dr. Hill's conclusion that she was capable of a significant range of work (Tr. 307). Second, Dr. Hill's finding that

-24-

Plaintiff's was moderately limited in this area stands at odds with Dr. Brady's consultative finding that Plaintiff had "good concentration" and was able to cope with "normal workplace stressors" (Tr. 214).

Finally, I note that the record as a whole supports the conclusion that Plaintiff was capable of performing unskilled work without significant psychologically based interruptions. May, 2010 psychological discharge notes characterize Plaintiff's psychological conditions as "mild" (Tr. 248). June, 2010 examination notes state that Plaintiff was fully oriented with a good memory and normal affect (Tr. 259). Psychological intake notes from the following month indicate that Plaintiff was able to travel in public "as needed," took care of her small child, worked part time, stayed within a budget, and enjoyed taking care of her family's housekeeping chores (Tr. 265, 267). Plaintiff's statement that as of July, 2010 she was "not seeking employment," (considered with her three earlier applications for disability benefits) supports the ALJ's inference that she was disinclined, rather than unable to work (Tr. 265, 345). Subsequent treating records also support the ALJ's finding that Plaintiff functioned well when taking psychotropic drugs as directed (353-354).

Accordingly, the determination that the Plaintiff was capable of a range of unskilled, light work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

**CONCLUSION**

For the reasons stated above, I recommend that Defendant's motion for summary judgment be GRANTED and that Plaintiff's motion for summary judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); and *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as

-26-

"Response to Objection #1," "Response to Objection #2," etc.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: August 4, 2014

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on August 4, 2014, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen